## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STEVEN JOSEPH D'AMICO,**

      **Petitioner,**

**vs.**                                          **CASE NO. 8:11-cv-20-T-27EAJM**

**SECRETARY OF DEPARTMENT**
**OF CORRECTIONS,**

      **Respondent.**

_____/

### O R D E R

Petitioner, a State of Florida inmate proceeding *pro se*, petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 and challenges the validity of his 1996 convictions for attempted first-degree murder and armed burglary of a dwelling. The Respondent challenges the timeliness of the petition. Upon review, the court concludes that the petition is timely but warrants no relief.

### Facts[1]

In the early morning hours of September 17, 1995, the victim, Richard Morgan, was awakened by footsteps in the hallway of his home. The victim opened his bedroom door and found Petitioner, an acquaintance of both the victim and the victim's roommate, standing in the hallway. Petitioner stated the victim's roommate had invited him into the house for a beer. The victim told Petitioner to leave but Petitioner refused. Petitioner asked the victim if he had any drugs and

---

[1] This factual summary derives from Petitioner's brief on direct appeal (Doc. 20, Ex. 2) and evidence adduced at trial.

inquired about money the victim owed to another drug dealer.[2]  The victim told Petitioner that he had the money he owed the other drug dealer.  Realizing he had revealed to Petitioner that he had cash in the house, the victim insisted Petitioner leave but Petitioner again refused and asked for a beer.  The victim gave Petitioner a can of beer which Petitioner eventually left on a table.  Petitioner headed down a hallway toward the restroom and the victim began walking toward the kitchen.  Petitioner came back down the hallway with a gun and shot the victim in the face.

The victim staggered to the front door and went across the street to a neighbor's house for help.  When the neighbor did not immediately answer the door, the victim, bleeding profusely, kneeled down on the sidewalk and wrote the name "Dave"[3] on the sidewalk in his own blood.  As he lay on the ground, the victim saw Petitioner leave his house.  The victim heard a car accelerate and saw a dark blue Cadillac drive away.  The victim knew that Petitioner owned a Cadillac.

A neighbor, Robert Rafferty, discovered the victim on the sidewalk and called 911.  The victim, believing he was dying, asked Rafferty to contact his loved ones and told him that "Biker Dave" was the person who shot him.  The victim was taken to the hospital.  Still believing he may die, the victim told Detective William Blake at the hospital that "Biker Dave" had shot him.  The victim survived his gunshot wounds.  He later discovered $1800 in cash missing from his home.[4]

---

[2]  The victim testified at trial that he sold marijuana.  (Doc. 20, Ex. 1, Vol. IV, p. 244).

[3]  The State charged Petitioner as "Steven Joseph D'Amico a/k/a David Curtis D'Amico."  (Doc. 20, Ex. 1, Vol. I, p. 17).  The victim identified Petitioner at trial as Dave D'Amico, whom he called "Biker Dave."  (Doc. 20, Ex. 1, Vol. IV, pp. 211, 239, 242-43).  Two other witnesses also identified Petitioner as "Biker Dave."  (Doc. 20, Ex. 1, Vol. II, p. 73, 96).  Petitioner signed his state post-conviction pleadings as well as his federal pleadings as "Steven D'Amico."

[4]  The victim testified that he had "right at two thousand" dollars in cash in his bedroom.  (Doc. 20, Ex. 1, Vol. IV, p. 236).

2

The victim identified Petitioner at trial as the person who shot him.  No physical evidence[5] connected Petitioner to the crime.  Petitioner unsuccessfully pursued an alibi defense and was convicted by a jury.

## Procedural background and timeliness

Petitioner was sentenced as a habitual felony offender to concurrent terms of life imprisonment for each conviction.  Petitioner appealed.  On February 27, 1998, Petitioner's convictions were affirmed in a *per curiam* decision without a written opinion.  (Doc. 20, Ex. 5).  Petitioner neither sought rehearing nor filed a petition for a writ of certiorari in the United States Supreme Court.

On March 4, 1999, Petitioner filed his first *pro se* motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 (the "1999 Rule 3.850 motion").  (Doc. 20, Ex. 6).  The state post-conviction court denied the motion in part and ordered the State to respond to certain grounds.  (Doc. 20, Ex. 7).  The state post-conviction court subsequently conducted evidentiary hearings[6] and ultimately denied the remaining grounds.  (Doc. 20, Exs. 8A, 8B).  Petitioner did not timely file an appeal.

---

[5] Crime scene detective Kim Copeland testified that she collected latent fingerprints from the back door of the victim's home and from a beer can taken from the victim's home.  (Doc. 20, Ex. 1, Vol. III, pp. 149-50).  Neither the prosecution nor the defense adduced testimony that the fingerprints had been submitted for examination to a latent fingerprint examiner.  Defense counsel highlighted in his closing argument the lack of physical evidence connecting Petitioner to the crime.  (Doc. 20, Ex. 1, Vol. VII, pp. 402-03, 409).

[6] Evidentiary hearings were held on March 15, 2001, June 7, 2001, and October 4, 2011.  (Doc. 20, Ex. 10, Vol. II, transcripts of March 15, 2001, evidentiary hearing, pp. 1-64 and October 4, 2001, evidentiary hearing, pp. 1-43; Vol. III, transcript of June 7, 2001, evidentiary hearing, pp. 1-20).

While the 1999 Rule 3.850 motion was pending, Petitioner filed his first Rule 3.800(a) motion to correct an illegal sentence on February 2, 2001 (the "2001 Rule 3.800(a) motion").[7] (Doc. 29, Ex. A). While the 2001 Rule 3.800(a) motion was pending, Petitioner filed a *pro se* petition for a belated appeal of the denial of the 1999 Rule 3.850 motion. The state district court of appeal granted the petition on March 20, 2003. (Doc. 20, Ex. 9). On September 2, 2005, the state district court of appeal affirmed the denial of the 1999 Rule 3.850 motion in a *per curiam* decision without a written opinion. (Doc. 20, Ex. 15). The state district court of appeal denied Petitioner's motion for rehearing on November 3, 2005. (Doc. 20, Ex. 16B).

Petitioner subsequently filed a second Rule 3.800(a) motion in January 2006 (Doc. 20, Ex. 21), a third Rule 3.800(a) motion in March 2008 (Doc. 20, Ex. 33) and a second Rule 3.850 motion in April 2009 (the "2009 Rule 3.850"). (Doc. 20, Ex. 45). The state post-conviction court denied all three motions (Doc. 20, Exs. 22, 34, 46) and those denials were affirmed in three *per curiam* decisions without written opinions in February 2008, February 2010, and September 2010, respectively. (Doc. 20, Exs. 28, 40, 51). In July 2011, the state post-conviction court granted

---

[7] In his motion Petitioner argued entitlement to resentencing without application of the habitual offender enhancement and sought to have Florida's habitual offender statute declared unconstitutional.

4

Petitioner's motion for voluntary dismissal of the 2001 Rule 3.800(a) motion.[8]  Petitioner filed his federal habeas petition on January 3, 2011.  (Doc. 1).

Respondent contends that the federal petition is untimely.[9]  However, Respondent has overlooked the tolling effect of the 2001 Rule 3.800(a) motion.[10]  Once triggered, the one-year federal limitation is tolled pending resolution of a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim."  28

---

[8]  Petitioner attached to his amended reply a copy of the state post-conviction court's order which confirms that the 2001 Rule 3.800(a) motion was pending in the state court for nearly ten years:

THIS MATTER is before the Court on Defendant's Motion to Voluntarily Dismiss Motion to Declare [Florida Statute] 775.084 Unconstitutional, filed on January 4, 2011.

In his motion Defendant moves the Court to dismiss his Motion to Declare 775.084 Unconstitutional, which was filed on February 2, 2001.

After reviewing Defendant's motion, the Court finds that it will grant Defendant's Motion.

(Doc. 29, Ex. A, July 15, 2011, order granting voluntary dismissal).

[9]  Respondent cites the following timeliness calculation:

Petitioner's convictions became final on February 27, 1998, when the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court expired.  *See* Sup. Ct. R. 13.3.  A period of 279 days elapsed between the date the convictions became final and the date that Petitioner filed his 1999 Rule 3.850 motion on March 4, 1999.  The Rule 3.850 motion remained pending until December 23, 2002, when the time for appealing the denial of that motion expired.  Respondent argues that the appeal of the denial of the 1999 Rule 3.850 motion was pending from March 23, 2003 (when the petition for belated appeal was granted) until the mandate issued on January 13, 2006.

After the January 13, 2006, issuance of the mandate, three untolled days elapsed before Petitioner filed his second Rule 3.800(a) motion on January 17, 2006.  Respondent argues that, because Petitioner filed his third Rule 3.800(a) motion while the second was still pending, the federal one-year limitation was tolled until the mandate issued in the appeal of the denial of the third Rule 3.800(a) motion on March 30, 2010.  After that date, 278 untolled days elapsed until Petitioner filed his Section 2254 petition on January 3, 2011.  Respondent argues that, by then, an aggregate period of over one year had elapsed, which was not statutorily tolled, rendering the instant petition untimely.

(Doc. 18, pp. 4-13).

[10]  Respondent omits the 2001 Rule 3.800(a) motion from its timeliness analysis despite the inclusion of the motion in Respondent's exhibits.  (Doc. 20, Ex. 10, Vol. III, pp. 663-71).

U.S.C. § 2244(d)(2).[11]   "[A]n application is properly filed when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8-9 (2000).  A state Rule 3.800(a) motion is an "application for State post-conviction or other collateral review" within the meaning of Section 2244(d)(2).  *Alexander v. Sec'y Dep't of Corr.*, 523 F.3d 1291, 1295 (11th Cir. 2008), *abrogated on other grounds by Wall v. Kholi*, ___ U.S. ___, 131 S. Ct. 1278, 179 L. Ed. 2d 252 (2011).   Because the record includes no evidence to the contrary, Petitioner's 2001 Rule 3.800(a) motion met state filing requirements and qualifies as a tolling motion under 28 U.S.C. § 2244(d)(2).  Accordingly, the following timeliness analysis results:

The state district court of appeal affirmed Petitioner's convictions on February 27, 1998.  The convictions became final on May 28, 1998, when the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court expired.  *See* Sup. Ct. R. 13.3.  The one-year federal limitation began running the following day on May 29, 1998.  Absent any tolling by a "properly filed" application for state post-conviction relief, Petitioner then had one year from that date, until May 29, 1999, to timely file a Section 2254 petition.

Between May 29, 1998 (when the convictions became final), and March 4, 1999 (when Petitioner filed his 1999 Rule 3.850 motion), 279 days of the one-year federal limitation elapsed.  While the 1999 Rule 3.850 motion was pending, Petitioner filed the 2001 Rule 3.800(a) motion.  That motion remained pending for nearly ten years until the state post-conviction court granted Petitioner's motion for voluntary dismissal in July 2011.  *See Carey v. Saffold*, 536 U.S. 214, 219-20

---

[11]  28 U.S.C. § 2244(d)(2) provides:

The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

(2002) ("[U]ntil the application [for state collateral review] has achieved final resolution through the State's post-conviction procedures, by definition it remains "pending."").  Consequently, the federal limitation was tolled from March 4, 1999 (when Petitioner filed his 1999 Rule 3.850 motion) until July 2011 (when the state post-conviction court granted Petitioner's motion for voluntary dismissal). Because only 279 days of the one-year federal limitation had elapsed before Petitioner filed his Section 2254 petition on January 3, 2011, the petition is timely.

Petitioner presents the following grounds for relief:

**Ground One:**  The state trial court judge erred by ruling that the victim's "dying declarations" were admissible hearsay

**Ground Two:**  The state trial court judge erred by admitting collateral crime evidence

**Ground Three:**  Petitioner was deprived of due process because the State failed to prove that the prior convictions used for application of the habitual felony offender sentence enhancement were, in fact, Petitioner's convictions

**Ground Four:**  Trial counsel rendered ineffective assistance by:

Claim (a):  not calling Dean Roberts to testify at trial

Claim (b):  not calling Jerry Viking to testify at trial

Claim (c):  not calling Robert Walborne to testify at trial

Claim (d):  not calling a fingerprint expert to testify at trial

**Ground Five:**  Trial counsel rendered ineffective assistance by not objecting to the admission of the victim's "dying declarations"

**Ground Six:**  Trial counsel rendered ineffective assistance by:

Claim (a):  not impeaching the victim with his prior inconsistent statements about the cash missing from his home

7

<u>Claim (b)</u>:    not impeaching the victim with his prior inconsistent statements about the clothing Petitioner was wearing on the night of the shooting

**Ground Seven:**    Trial counsel rendered ineffective assistance by not conducting a pre-trial investigation into Petitioner's competency to stand trial

**Ground Eight:**    The prosecutor improperly presented perjured testimony

**Ground Nine:**    The cumulative effect of trial counsels' errors "altered the entire evidentiary picture and the verdict was only weakly supported by the record"

**Ground Ten:**    The state post-conviction court deprived Petitioner of due process during his post-conviction proceedings by denying his request for appointment of counsel for the Rule 3.850 evidentiary hearings

**Ground Eleven:**    The stat post-conviction court deprived Petitioner of due process by denying his *Brady*[12] and *Giglio*[13] claims raised in his second Rule 3.850 motion

## **Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs this proceeding. *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d), which creates a highly deferential standard for federal court review of state court adjudications, states in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

---

[12] *See Brady v. Maryland*, 373 U.S. 83 (1963).

[13] *See Giglio v. United States*, 405 U.S. 150 (1972).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 693. Federal courts must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010).

In a *per curiam* decision without a written opinion the state district court of appeal affirmed Petitioner's convictions on direct appeal. In two other *per curiam* decisions the state district court of appeal affirmed the denial of Petitioner's two Rule 3.850 motions. The *per curiam* affirmances warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).

Petitioner bears the burden of overcoming a state court factual determination by clear and convincing evidence. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact, but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state courts' rejection of Petitioner's post-conviction claims warrants deference in this action.

### Standard of Review for Ineffective Assistance of Counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland v. Washington*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," Petitioner must demonstrate that counsel's error prejudiced the defense. *Strickland v. Washington*, 466 U.S. at 691-92. To meet this burden, Petitioner must show "a reasonable probability that, but for

11

counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.  Petitioner cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful:

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . .  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable. . . .  [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

## Discussion

**Grounds One and Five**

The victim testified at trial to statements he made to both Robert Rafferty and Detective William Blake.  In Ground One Petitioner contends that the state trial court judge erred by admitting, over defense counsel's objection, some of the victim's statements under the "dying declaration" exception to the hearsay rule.  Petitioner claims that the statements were inadmissible because the

victim testified at trial.[14]   Petitioner argues that "[t]he trial court improperly allowed introduction of inadmissible evidence and counsel failed to properly object thereto," resulting in a denial of his Fifth, Sixth, and Fourteenth Amendment rights. (Doc. 1, p. 4).

In Ground Five Petitioner alleges that his trial counsel rendered ineffective assistance by not objecting to the admission of the victim's dying declarations.  Petitioner asserts that trial counsel "failed" when both Rafferty (the victim's neighbor who is a retired Washington D.C. detective) and Blake (a detective with the Hillsborough County Sheriff's Office) provided hearsay testimony. Petitioner argues that, "[a]s a matter of law, counsel had a reasonable duty to object to this evidence because a 'dying declaration' can only be admitted when the declarant is unavailable for trial." (Doc. 1, p. 9).  Petitioner claims that "[t]he improper bolstering of [the victim]'s testimony tipped the balance . . . in the credibility contest presented to the jury."  (Id.).  Petitioner contends that the state post-conviction court failed to apply *Strickland* "in a reasonable manner and unreasonably determined the facts" by "elevat[ing] form over substance by denying t[his] claim *only* because the specific pages [of the trial transcript] were not cited in the state post-conviction motion, denying due process of law and opening this claim to *de novo* review by this court."  (Id.).

---

[14]  Section 90.804(2)(b), Florida Statutes, provides:

> (2) Hearsay exceptions.  The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
>
> . . . .
>
> > (b) *Statement under belief of impending death.*  In a civil or criminal trial, a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death.

a.     Ineffective Assistance of Counsel

The state post-conviction court summarily rejected Petitioner's ineffective assistance of

counsel claim in the 1999 Rule 3.850 motion:

> Defendant claims counsel failed to properly object . . . when the State introduced and
> the Court admitted into evidence a "dying declaration" by an available and testifying
> declarant, several law enforcement officers, and other witnesses.  Defendant claims
> that, while counsel did object, counsel's objection was general and not specific
> enough to satisfy the contemporaneous objection rule.  Defendant further claims that
> counsel failed to pose a proper and adequate objection to the State's parading of
> Robert Rafferty, the victim's neighbor, and a retired Washington D.C. police
> detective, and William Blake, an employee of the Hillsborough County Sheriff's
> Department, to testify to hearsay statements purportedly made as a dying declaration.
>
> However, Defendant has failed to specifically allege the hearsay statements that
> counsel failed to specifically object to.  Therefore, Defendant has failed to meet the
> first prong of *Strickland* in that he has failed to prove deficient conduct.  Since
> Defendant has failed to meet the first prong of *Strickland*, it is unnecessary to address
> the prejudice component.  As such, no relief is warranted upon this ground.

(Doc. 20, Ex. 7, pp. 15-16) (court's record citations omitted).

As in his 1999 Rule 3.850 motion, Petitioner cites to several pages of the trial transcript of

Rafferty's and Blake's testimony but does not specify what statements counsel failed to object to.

Notwithstanding, and contrary to Petitioner's contention, the record shows that trial counsel objected

on hearsay grounds to Rafferty's testimony during direct examination by the prosecutor.[15]  Trial

---

[15]  Counsel inquired of Rafferty:

Q:     Okay.  When you went outside, did you come into contact with the person who you said was
       [the victim]?

A:     Yes, I did.

. . . .

Q:     And what, if anything, did you do at that point?

A:     I made him lay down.  He was bleeding very badly and I made him lay down because I had

(continued...)

14

[15](...continued)

> seen him run across the street.  He was over there in front of these people's door coming back, like he was going back across the street, and by his actions, if I hadn't made him lay down, I felt he would do more damage to himself because he had his blood pressure pumped up and he was pumping out more blood and I wanted him to stop that.  So I made him lay down in the public space area here so I could get help for him.

. . . .

Q:     At that point did you all have some conversation regarding his condition?

A:     I believe first that I went back into my house, got my phone, called 911.  I came back out with the phone to call 911.  After I contacted them, we had a conversation.

Q:     All right.  And in that conversation, did you all discuss his health and what he thought?

A:     Yes, sir.

Q:     And what was the substance of that?

[Counsel]:  Objection, hearsay.

Court:    Overruled.

A:     [The victim] thought he was dying.  He was very scared.  He was very frightened and he asked me to contact his parents.  He gave me their first names.  He wanted me to tell them that he loved them and he asked me - - he gave me their phone number and told me to tell them that.

Q:     All right.  And after he did that, did you ask him or did he tell you who it was that had actually shot him?

A:     I asked him.

Q:     Or what had happened to him?

A:     I asked him what had happened.

Q:     And what, if anything, did he tell you?

[Counsel]:  Objection, hearsay.

Court:    Overruled.

A:     [The victim] related to me - - I asked him who shot him and he stated, "Biker Dave," and I asked him to describe "Biker Dave" to me, and he described him as a white male about 35 or 40 and that he was driving a blue Cadillac.

Q:     And once you got that description, what did you do with that?

(continued...)

15

---

[15](...continued)

A:       I wrote it down on a piece of paper, which I gave to the police when they responded.

. . . .

[Prosecutor]:  Judge, I've got no further questions of this witness at this time.

Court:    Approach the bench.

(Following proceedings had at bar):

Court:    We're going to need some more testimony to flush out why this guy says he thought [the victim] thought he was dying.  All he said was he thought [the victim] thought he was dying.  He made some reference to call his parents and tell them that he loved them, but I assume he had other reasons to say what he said about [the victim] thought he was dying.  So let's get into that because otherwise we're going to have a problem with this statement.

[Counsel]:  Yes, and if I may, Your Honor, that was toward my hearsay objection.

Court:    I figured and I figured you had some - -

[Counsel]:  My objection would be that pursuant to the case law, the only information that could come out, if the court ruled they believed that the defendant [sic] thought that he was impending death, that the only information that could come out would be his identification of the perpetrator, but based on the case law that any other information, that is, contacting the parents and things of that nature, would be hearsay.

Court:    No.  Overruled.

(Following proceedings had in open court):

. . . .

Q:       And when [the victim] was laying on the side of the road, could you elaborate as to what went on there regarding him believing he was dying, why he believed he was dying?

A:       Objection, calls for speculation.

Court:    Just tell us why you said [the victim] thought he was dying, Detective Rafferty.

A:       From my observations, [the victim] was very scared, as scared as I've seen anyone.  There was no question in my mind that he believed that he was going to die.

Q:       Did he tell you, "I believe I'm - - I'm dying?"

A:       Yes.

Q:       And - -

(continued...)

counsel also objected to the admission of the victim's hearsay statements during Detective Blake's

testimony.[16]

_____

[15](...continued)

[Counsel]:  Objection, hearsay.

Court:   Overruled.

(Doc. 20, Ex. 1, Supp. V, pp. 59-64).

[16]   Counsel inquired of Detective Blake:

Q:       And in relationship to [your] assignment [as a detective in the Hillsborough County Sheriff's
         Office Criminal Investigation Bureau] . . . were you, in fact, one of the lead detectives in this
         case?

A:       Yes, I was.

. . . .

Q:       [W]hat was your first point of involvement?  Where did you go?

A:       I was contacted by my supervisor to respond to Tampa General Hospital emergency room
         because there was a gunshot victim there that they were not sure as to his condition and did
         not know whether he was going to live or die at that point.

[Counsel]:  Objection, hearsay.

Court:   Overruled.

. . . .

Q:       All right.  Now, when you got in contact with [the victim], did you actually - - did he express
         any concerns to you regarding whether he would live or die?

[Counsel]:  Objection, hearsay.

Court:   Overruled.

. . . .

Q:       Did [the victim] tell you whether he believed that he may be dying?

A:       No.

[Counsel]:  Again, Your Honor, I'm going to object to hearsay.

Court:   Overruled.  The answer was no.

(continued...)

17

Contrary to Petitioner's contention, trial counsel did, in fact, object to the admission of Rafferty's and Blake's testimony about the victim's "dying declarations."  The gravamen of Petitioner's claim is that counsel did not argue strenuously enough against the admission of the victim's statements or object on a particular basis.  Such an allegation is insufficient to establish a federal constitutional violation.  Petitioner fails to demonstrate a reasonable probability exists that further objection to either Rafferty's or Blake's testimony on the same basis already rejected by the state trial court judge would have resulted in (1) the exclusion of the victim's statements or (2) a different outcome at trial.  Consequently, the state post-conviction court's rejection of this claim of ineffective assistance of counsel is neither an unreasonable application of *Strickland* nor an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1), (2).  Ground Five warrants no relief.

       b.    <u>Due Process</u>

To the extent that Petitioner is asserting a substantive federal due process claim based upon the admission of the victim's statements under the "dying declaration" exception to the state hearsay rule, he cannot obtain relief.  Federal habeas relief for a person in custody under the judgment of a state court is available only on the ground that the custody violates the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a). A challenge to the admission of evidence under state

---

[16](...continued)

. . . .

Q:      What did he say to you regarding his feelings as to whether he was going to die?

[Counsel]:  Objection, relevance, asked and answered.

Court:    I think you're probably right, but overruled.

(Doc. 20, Ex. 1, Vol. III, pp. 153-55).

evidentiary rules is a matter of state law that provides no basis for federal habeas corpus relief because the ground does not present a federal constitutional question. 28 U.S.C. § 2254(a). *See also Swarthout v. Cooke*, ___ U.S. ___, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (internal quotations and citations omitted); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."); *Krasnow v. Navarro*, 909 F.2d 451, 452 (11th Cir.1990) ("A writ of habeas corpus is available in federal court only in cases of constitutional error."). The limitation on federal habeas review to claims of federal constitutional error applies with equal force when a petition, which actually involves state law issues, is couched in terms of a Fourteenth Amendment due process violation. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976). Consequently, Petitioner's due process claim based upon the admissibility of the victim's "dying declarations" under state evidentiary rules is not a cognizable claim for relief.

Notwithstanding cognizability, review of Ground One is precluded by Petitioner's failure to exhaust the federal dimension of this claim. Before a federal court may grant habeas relief, a petitioner must exhaust every available state court remedy for challenging his conviction, either on direct appeal or in a state post-conviction motion. 28 U.S.C. § 2254(b)(1)(A), (C). "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal

habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted)).  A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt v. Jones*, 348 F.3d 1355, 1358 (11th Cir. 2003).

A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358-59 (quoting *Boerckel*, 526 U.S. at 845).  To exhaust a claim, a petitioner must present the state court with the particular legal basis for relief in addition to the facts supporting the claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

Petitioner did not present in his direct appeal brief in the state court a federal due process claim based upon the admission of the victim's statements.[17]  By failing to present the federal claim

---

[17] Petitioner in his direct appeal brief cited several federal cases, all of which deal with the admissibility of a dying declaration under federal evidentiary rules but not a federal due process violation.  The requirement that a federal habeas corpus petitioner exhaust available state court remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court, alerting that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).  A petitioner may raise a federal claim in state

(continued...)

to the state courts, Petitioner deprived the state courts of a "full and fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845.  Petitioner cannot return to state court to present a federal due process claim because state procedural rules preclude a second direct appeal.  Consequently, the claim is unexhausted and procedurally defaulted.

Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).  To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  *See also Murray v. Carrier*, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions.  *United States v. Frady*, 456 U.S. 152 (1982).  In other words, he must show at least a reasonable probability of a different outcome. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003); *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a fundamental miscarriage of justice.

---

[17](...continued)

court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese,* 541 U.S. 27, 32 (2004).  Petitioner did not present to the state appellate court a substantive federal due process claim based upon the allegations he asserts in Ground One his federal petition.

*Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96.   A fundamental

miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably

resulted in the conviction of someone who is actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 327

(1995).  This exception requires a petitioner's "actual" innocence.  *Johnson v. Alabama*, 256 F.3d

1156, 1171 (11th Cir. 2001).  To meet this standard, a petitioner must show a reasonable likelihood

of acquittal absent the constitutional error.  *Schlup*, 513 U.S. at 327.

Recognizing his default, Petitioner argues in his reply that the ineffective assistance of trial

counsel is cause to excuse his default:

> Although Petitioner had not asserted at trial or on his direct appeal that the erroneous admission of [the victim]'s hearsay statements under the dying declaration exception constituted a violation of the federal constitution, he had raised a claim . . . that trial counsel was ineffective for failing to object to the hearsay on constitutional due process grounds.  That claim provides cause to excuse any procedural default by Petitioner in not arguing the federal aspect of his hearsay issue.

> Moreover, because Petitioner had a right to effective assistance of direct appeal counsel, his counsel's failure to argue the hearsay issue as a federal due process violation also provides cause to excuse any procedural default.  Although a claim of ineffective assistance must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default, *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000), where the claim involves the failure to exhaust the constitutional dimension of a ground for federal habeas corpus relief, the claim need not also be exhausted because the state courts would not be in a position to offer meaningful relief.

(Doc. 29, pp. 32-33).

Ineffective assistance of counsel can constitute cause to excuse procedural default.  *Eagle v.*

*Linahan*, 279 F.3d 926, 937 (11th Cir. 2001).  A petitioner seeking to show that counsel's ineffective

assistance was the cause of a default must first prove his underlying ineffective assistance claim,

establishing that counsel's performance was "so ineffective as to violate the Federal Constitution."

*Carpenter*, 529 U.S. at 451.  If a petitioner cannot establish a separate ineffective assistance of counsel claim, he cannot prevail on an argument that the ineffective assistance caused the procedural default.  *Id.*

To the extent that Petitioner argues that trial counsel's failure to object on due process grounds to the admission of the victim's statements (and preserve the issue for appeal) is cause for his failure to present the due process claim on direct appeal, he cannot prevail.  As discussed, *supra*, Petitioner fails to satisfy *Strickland's* requirements to sustain his ineffective assistance of trial counsel claim.  Consequently, Petitioner cannot prevail on an argument that the ineffective assistance caused the procedural default.  *Edwards*, 529 U.S. at 451.

To the extent that Petitioner argues that the ineffective assistance of his appellate counsel (i.e., not raising the federal dimension of his claim in the appellate brief) is cause for his default, he likewise cannot prevail.  Petitioner admits in his reply that he has not exhausted an ineffective assistance of appellate counsel claim.  (Doc. 29, p. 33).  Because Petitioner is now precluded from seeking review of that claim in a state habeas petition,[18] Petitioner's ineffective assistance of appellate counsel claim is itself procedurally defaulted and cannot be considered as cause for the default of his federal due process claim.  *See Carpenter*, 529 U.S. at 450-51 (concluding that a federal habeas court is barred from considering a procedurally defaulted ineffective assistance of counsel claim as cause for procedural default of another claim); *Hill v. Jones*, 81 F.3d 1015, 1029-31

---

[18]  Rule 9.141(d)(5), Florida Rules of Appellate Procedure, provides:

A petition alleging ineffective assistance of appellate counsel on direct review shall not be filed more than 2 years after the judgment and sentence become final on direct review unless it alleges under oath with a specific factual basis that the petitioner was affirmatively misled about the results of the appeal by counsel. In no case shall a petition alleging ineffective assistance of appellate counsel on direct review be filed more than 4 years after the judgment and sentence become final on direct review.

(11th Cir. 1996) (noting that "*Carrier* and the rest of the Supreme Court's jurisprudence on procedural default dictate that procedurally defaulted claims of ineffective assistance *cannot* serve as cause to excuse a default of a second claim") (emphasis in original).

Petitioner fails to demonstrate cause and prejudice excusing the default of his federal due process claim. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Petitioner fails to proffer specific facts showing an exception to procedural default, the substantive due process claim alleged in Ground One is procedurally barred from federal review.

**Ground Two**

Petitioner contends that the state trial court judge's erroneous admission of collateral crime evidence resulted in a violation of Petitioner's rights to due process and a fair trial. Specifically, Petitioner claims:

> The first instance regarded a 9mm projectile found within a wall of Petitioner's home. This projectile was not linked in any way, shape, or form to the charges on trial. This evidence established no relevant fact, only Petitioner's propensity to commit crimes (i.e., possession of a firearm despite being a convicted felon).

> The second instance regarded an allegation by [the victim] that Petitioner had stolen from him previously.[19] No theft occurred in this case and, thus, the allegations of

---

[19]  The victim testified on re-direct examination about a previous conversation he had with Petitioner:

Q:      Okay. Now, [defense counsel] talked to you about the conversation that you had with the defendant at his home when he gave you [Petitioner's former girlfriend's] things.

A:      Uh-huh.

Q:      And [counsel] said it was amicable and everything. She said you all were getting along. You said it was tense but you all weren't fighting or anything, correct?

A:      No. We weren't fighting. I tried to keep it as brief as possible. [The victim] wanted me to go have a beer with him and stuff and I told him that I felt that he stole some money from me,

(continued...)

prior theft w[ere] irrelevant to any material fact in this trial. This evidence only attacked Petitioner's character and introduced a propensity to commit crimes.

(Doc. 1, p. 5).

Although Petitioner raised these same allegations on direct appeal, he did not argue a violation of his federal right to either due process or a fair trial. First, with respect to the projectile, Petitioner argued in his direct appeal brief that the admission of the projectile violated his federal right to an impartial jury. (Doc. 20, Ex. 2, pp. 37-39). Petitioner argues in his reply that his claim on direct appeal that "irrelevant testimony about the 9mm projectile had deprived him of his right to an impartial jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution . . . served to adequately exhaust Petitioner's claim regarding the projectile." (Doc. 29, pp. 35-36). Contrary to Petitioner's contention, his assertion of a violation of one particular federal right (i.e., impartial jury) was not sufficient to apprise the state appellate court that he also asserted a violation of his federal rights to due process or a fair trial. Both claims are unexhausted because Petitioner deprived the state courts of a "full and fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. Petitioner cannot return to state court to present either federal claim based on the alleged improper admission of the projectile because state procedural rules preclude a second direct appeal. Consequently, this portion of ground two is procedurally defaulted.

Second, with respect to the admission of the victim's testimony that Petitioner had previously stolen property from him, Petitioner admits that he did not exhaust the federal dimension of this

_____

[19](...continued)
> that he owed me money. I told him I didn't want anything to do with him.

(Doc. 20, Ex. 1, Vol. IV, p. 281).

claim and that his argument in his direct appeal brief "did not include any references to the federal constitution." (Doc. 29, p. 36). Petitioner argues, however, that "[s]ince he had a right to effective assistance of direct appeal counsel, Petitioner has cause to excuse his procedural default of the claim." (Id.). As discussed in grounds one and five *supra*, any alleged ineffective assistance of appellate counsel cannot be considered cause for the default of the federal due process and fair trial claims because the ineffective assistance of appellate counsel claim itself is procedurally defaulted. *See Edwards*, 529 U.S. at 450-51; *Hill*, 81 F.3d at 1029-31.

Petitioner fails to demonstrate cause and prejudice excusing his default of either the federal due process claim or federal fair trial claim. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Petitioner fails to proffer specific facts showing an exception to procedural default, both claims in Ground Two are procedurally barred from federal review.

**Ground Three**

Petitioner was sentenced as a habitual felony offender based, in part, on certain prior out-of-state convictions. Petitioner contends that none of the documents detailing his prior convictions in Ohio "bore a reliable indicia of identification (i.e., fingerprints or photographs)" and, therefore, he was incorrectly sentenced as a habitual felony offender. (Doc. 1, p. 7). The state appellate court rejected this ground on direct appeal and the state post-conviction court rejected this ground in Petitioner's second Rule 3.800(a) motion. (Doc. 20, Exs. 5, 28). Petitioner argues that "[t]he state courts denied [him] due process of law in upholding the sentence on both direct appeal and in post-conviction proceedings," and that because "the state failed to prove the prior convictions were Petitioner's, and cannot do so, upholding the sentence imposed is a decision contrary to, or an

26

unreasonable application of, controlling Supreme Court precedent or an unreasonable determination of record facts warranting habeas relief." (Doc. 1, p. 7).

Petitioner does not cite any legal authority to support this ground. The gravamen of Petitioner's claim is a challenge to the state trial court's application of a sentencing enhancement under state sentencing guidelines, a claim that does not present a basis for federal habeas corpus relief because the claim does not present a federal constitutional question. 28 U.S.C. § 2254(a). "In the area of state sentencing guidelines in particular, [the Eleventh Circuit has] consistently . . . held that federal courts cannot review a state's alleged failure to adhere to its own sentencing procedures. This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'" *Branan*, 861 F.2d at 1508. Consequently, Ground Three warrants no relief.[20]

## Ground Four

Petitioner contends that his trial counsel rendered ineffective assistance by not investigating and calling as witnesses Dean Roberts, Jerry Viking, and Robert Walborn, all of whom could have testified that "the 9mm slug extracted from the wall of Petitioner's rented home was present prior to Petitioner's occupancy."[21] (Doc. 1, p. 8). Petitioner claims that Roberts also could have been an

---

[20] Cognizability aside, Petitioner is not entitled to relief. In his direct appeal Petitioner challenged the validity of the out-of-state documents used to support application of the habitual felony offender enhancement on double jeopardy grounds but did not assert a federal due process claim. Apparently unsatisfied with the state appellate court's rejection of that argument, Petitioner again challenged the validity of the out-of-state documents in his second Rule 3.800(a) motion on due process and equal protection grounds. (Doc. 20, Ex. 21). The state post-conviction court rejected the claim as facially insufficient under state law. (Doc. 20, Ex. 22, p. 1).

[21] Evidence adduced at trial established that Petitioner had access to a firearm before the shooting. The police recovered from the victim's home the 9mm bullet that had passed through the victim's face. The police also recovered a 9mm bullet from a wall in Petitioner's home. A ballistics expert concluded that both bullets were the same caliber but could not confirm or deny that the bullets had been fired from the same gun. (Doc. 20, Ex. 1, Vol. III, pp. 192-94, 197). The police did not recover the gun used in the shooting.

(continued...)

alibi witness.  Petitioner further contends that his trial counsel rendered ineffective assistance by not presenting "favorable" fingerprint evidence from the crime scene which would have established that Petitioner was not inside the victim's home when the victim was shot.  Petitioner argues that trial counsel's failure to "investigate and present these material facts left Petitioner in a swearing match with the victim at trial," resulting in a denial of Petitioner's rights to call witnesses, a fair trial, and the effective assistance of counsel.  (Doc. 1, p. 8).

The state post-conviction court afforded Petitioner an evidentiary hearing on this ground.

(a)  <u>Dean Roberts</u>

Petitioner claims that Roberts could have testified as an alibi witness and testified that the bullet extracted from the wall in Petitioner's home was already there when Petitioner moved in. Roberts testified at the Rule 3.850 evidentiary hearing that he observed bullet holes in the wall when

---

[21](...continued)
The prosecutor testified at the evidentiary hearing about the significance of the bullet holes:

Q:      And there was evidence elicited from the State during the trial about bullet holes that were found in one of the walls, interior walls, of the defendant's house during the search?

A:      There was.  When the police went to the defendant's home they interviewed, I believe, it was a roommate of the defendant, who told the police that the defendant had, on occasion while sitting on the sofa, shot holes in the wall or shot the projectiles into the wall of the living room.  The police had removed some of the projectiles and had sent them to a lab for testing, which had revealed that because - - if I can back up.

The projectile that went through [the victim]'s head passed through one or two of the walls in the home.  It was found in the garage on a concrete floor.  And that projectile was compared to the projectile from the wall.  While they could not say that it was a certain gun or weapon used to shoot [the victim], they could determine that it was one in the same type of ammunition and it came from the same class of weapon, same lands and grooves.  They just couldn't tell it was the identical weapon.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 25-26).  Evidence of the bullet holes and the bullet from Petitioner's home was used at trial, in part, to establish that Petitioner had possessed both a firearm and the same type of ammunition (9mm) used in the shooting.

he helped Petitioner move into the house.  (Doc. 20, Ex. 10, Vol. II, transcript of October 4, 2001, evid. hrg, pp. 5-6).  Roberts did not testify at the evidentiary hearing about an alibi.

Petitioner was represented at trial by public defenders Mary Lou Cuellar, Esq., and Ed Friscia, Esq., both of whom testified at the Rule 3.850 evidentiary hearing.  As to not calling Roberts, both Cuellar and Friscia testified that they reviewed their case file but found no notation of either Roberts's name or of Petitioner ever telling them that Roberts was a potential defense witness.[22]  Conversely, Petitioner testified that he did, in fact, give counsel Roberts's name but that Cuellar "never even had called Dean Roberts."  (Doc. 20, Ex. 10, Vol. II, pp. 10, 14).

Following the evidentiary hearing, the state post-conviction court rejected Petitioner's ineffective assistance of counsel claim:

> Defendant claims that counsel was ineffective in failing or neglecting to investigate certain alibi witnesses who were available and could have testified at trial.  In cases involving claims of ineffective assistance of counsel for failure to investigate and

---

[22]  Cuellar testified:

Q:      And Dean Roberts.  After going through your file and documentation, was that name ever given to you?

A:      I can't find that anywhere. I believe I looked up every witness. I went through the P.D.'s file several times and I didn't see that in there and I don't recall that name, so, you know, based on looking through the file and not being able to recall that from the case itself, I don't believe that I ever had that name.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 41-42, 45).  Cuellar reiterated on cross-examination that she did not have information about Roberts in her file.  (Id. at pp. 56-57).

Friscia similarly testified:

Q:      The name Dean Roberts, to the best of your recollection, was that name ever provided by the defendant?

A:      No, it was not.  I reviewed the file.  It was never on the State's witness list.  It was not on our subpoena list, our witness list, or any notes that were reflected in the file.

(Doc. 20, Ex. 10, Vol. III, transcript of June 7, 2001, evid. hrg, p. 6).

interview witnesses, facially sufficient post-conviction motions must include: identity of prospective witnesses; substance of witnesses' testimony; and explanation as to how omission of such evidence prejudiced [the] outcome of the trial. *Highsmith v. State*, 617 So. 2d 825 (Fla. 1st DCA 1993).

As to Mr. Dean Roberts, Defendant must meet the *Highsmith* test. Defendant has alleged who the witness was and what his testimony would be. Furthermore, Defendant argues that a different outcome would have resulted in that "Defendant would have been acquitted of a crime he did not commit." However, at the October 4, 2001, evidentiary hearing, Mr. Dean Roberts did not provide any testimony regarding an alibi for the Defendant. Consequently, Defendant has failed to demonstrate any prejudice by a failure to call Mr. Roberts as an alibi witness and has failed to satisfy the second prong of *Strickland*. As such, no relief is warranted as to [this claim].

. . . .

Defendant claims that counsel was ineffective in failing or neglecting to investigate certain witnesses who were available and could have testified at trial that the 9mm projectiles recovered from the Defendant's residence had been lodged in the walls long before he moved in and [the victim] was shot.

. . . .

As to Dean Roberts, Defendant has met the *Highsmith* test. Defendant has identified the witness and alleged that Mr. Roberts would have testified that the 9mm projectiles recovered from Defendant's residence had been lodged in the walls long before Defendant moved in and [the victim] was shot. Furthermore, Defendant argues that a different outcome would have resulted in that "Defendant would not have been convicted of a crime he did not commit." However, during the October 4, 2001, hearing, Mr. Roberts testified that, although there were some bullet holes at the Defendant's apartment, he did not know if the holes contained any slugs. Additionally, Mr. Roberts was unaware that a live 9mm round, the bullet used in this case, was found in the Defendant's apartment. Based on the testimony of Mr. Roberts, the court finds that there was no prejudice to the Defendant by Mr. Roberts not testifying at trial. Defendant has not proven that any bullet holes that existed prior to his moving into the apartment contained any slugs. . . . Consequently, Defendant has failed to demonstrate any prejudice by a failure to call Mr. Roberts as a witness and has failed to satisfy the second prong of *Strickland*. As such, no relief is warranted as to [this claim].

(Doc. 20, Ex. 8A, pp. 6-7) (court's record citations omitted).

The record supports the state post-conviction court's rejection of these claims. Petitioner has not presented any evidence to substantiate his claim that Roberts would have testified, as he hypothesizes, that the bullet extracted from the wall in Petitioner's home was already there when Petitioner moved in. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted).

Petitioner acknowledges that Roberts did not provide any testimony at the evidentiary hearing regarding an alibi but attributes this omission to the ineffective assistance of post-conviction counsel. (Doc. 29, pp. 19-20). To the extent that Petitioner attempts to assert an independent substantive claim of ineffective assistance of post-conviction counsel, he cannot obtain relief. "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). *See Chavez v. Sec'y, Fla. Dep't of Corr.*, ___ F.3d ___, 2014 WL 504720 at *4 (11th Cir. 2014) (noting that *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012),[23] did not create a freestanding claim for challenging a conviction or sentence based on the alleged ineffective assistance of post-conviction counsel). *See also Jimenez v. Fla. Dep't of Corr.*, 481 F.3d

---

[23] *Martinez* applies when a petitioner seeks to argue ineffective assistance of post-conviction counsel as "cause for a prisoner's procedural default of a claim of ineffective assistance *at trial*." 132 S.Ct. at 1315 (emphasis added). Petitioner is asserting ineffective assistance of post-conviction counsel as cause for post-conviction counsel's failure to call a witness or elicit testimony during a collateral proceeding, not as cause for failing to raise an ineffective assistance of trial counsel claim in the Rule 3.850 motion. Consequently, *Martinez* does not apply to Petitioner's claim because there was no default of the ineffective assistance of trial counsel claim. *See Arthur v. Thomas*, 739 F.3d 611, 629-31 (11th Cir. 2014) (explaining that *Martinez* only applies to the issue of cause to excuse the procedural default of an ineffective assistance of trial counsel claim that occurred in a state collateral proceeding).

1337, 1343 (11th Cir. 2007) (finding that 28 U.S.C. § 2254(i) explicitly barred petitioner's claim that the ineffective assistance of state-appointed counsel in his post-conviction proceedings deprived him of his state-created right to a full and fair state post-conviction process).  Because "there is no right to an attorney in state post-conviction proceedings," *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013), "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Petitioner fails to support his speculative contention that Roberts's proposed testimony about either an alibi or the 9mm bullet would have established reasonable doubt about Petitioner's guilt and resulted in a different outcome at trial.  Petitioner fails to meet either *Strickland's* deficient performance requirement or prejudice requirement to support these claims of ineffective assistance of counsel.  *Strickland*, 466 U.S. at 691-92.  The state post-conviction court neither unreasonably applied *Strickland* nor unreasonably determined the facts in rejecting these claims.  *See* 28 U.S.C. § 2254(d)(1), (2).

(b)  Jerry Viking and (c)  Robert Walborn

Petitioner contends that both Viking and Walborn would also have testified at trial that "the 9mm slug extracted from the wall of Petitioner's rented home was present prior to Petitioner's occupancy."  (Doc. 1, p. 8).  Attorney Cuellar testified at the evidentiary hearing that she unsuccessfully attempted to locate Viking before trial.[24]  Cuellar also testified that she elicited at trial

---

[24] Cuellar testified:

Q:      Okay.  I want to talk to you about some of these witnesses.  There is an allegation that you
        had failed to investigate certain witnesses who were available and could have testified about
        the issue of 9 millimeter projectiles that w[ere] recovered from the defendant's home.  Was
        the name Jerry Viking ever given to you?

(continued...)

32

favorable testimony from Walborn.[25]  Post-conviction counsel did not call either Viking or Walborn

_____

[24](...continued)

A:      I searched through the file and, again, I'm going to backtrack to answer the question. . . . I [k]now at [one] point I found out about Mr. Viking.  I was initially given Jeff Owens, who was [Petitioner's] roommate, Joanna Leashna, who were neighbors, and Rodney Bachman.

Those were the witnesses that I ended up giving my investigator to try to locate and find.  And then on February 11th I was given the name of - - I reviewed his witness Lee Rodney Bachman, Jeff Owens, Joe Allisandro and Jeff Lofta, so he was consistent with giving me people even when we reviewed the witness list.

In going through the notes of the file I see a notation in April, which would have been right before the trial, that I have an indication [about] Jerry Viking and he owned the property the defendant rented and can testify about the bullet holes, and that's the only information.  I didn't get an address on him.

Mr. D'Amico told me that it was in the phonebook under Viking Electric Company and I don't believe I could locate him.  And I believe that when we got around to deciding who was going to testify and who wasn't, we discussed that Mr. Owens was able to testify about the bullet holes, which was the only thing that Mr. Viking was going to have the information on, so it was in my recollection we came down to the fact that we didn't need Mr. Viking, so that's what I recall about him.

Q:      And when you're talking about testifying about the bullet holes, that would be to testify that they were there before the defendant moved into that residence?

A:      Correct, that Mr. D'Amico did not put them there, that they were already there when they moved in, and Mr. Owens, his roommate, testified to that fact at trial.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 42-44).

Cuellar further testified that she and co-counsel did not consider the bullet holes a significant issue in the case:

Q:      Before we leave that topic, the issue of the bullet holes in the wall, did you and your co-counsel consider that to be a major issue in this case?

A:      To be honest with you, I did not think that . . . really based on getting out of the witnesses that, you know, nobody could date those bullet holes, especially because our own witnesses said they were already there, so I didn't think that it was anything that made or broke the case itself.

But I do know that we got it out that, you know, that nobody could date those bullet holes as far as when they were put there and that specifically it was elicited that they were there before Mr. D'Amico ever moved into the home, so he wasn't the one that put them there as far as the testimony that was elicited in trial.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 45-46).  Neither Petitioner nor co-counsel Friscia were questioned about Viking at the evidentiary hearing.

  
to testify at the evidentiary hearing.

Following the hearing, the state post-conviction court rejected Petitioner's ineffective assistance of counsel claims:

> Defendant claims that counsel was ineffective in failing or neglecting to investigate certain witnesses who were available and could have testified at trial that the 9mm projectiles recovered from the Defendant's residence had been lodged in the walls long before he moved in and [the victim] was shot.

> As to Jerry Viking, Defendant has met the *Highsmith* test. Defendant has identified the witness and alleged that Mr. Viking would have testified that the 9mm projectiles recovered from Defendant's residence had been lodged in the walls long before Defendant moved in and [the victim] was shot. Furthermore, Defendant argues that a different outcome would have resulted in that "Defendant would not have been convicted of a crime he did not commit." However, Defendant failed to call Mr. Viking to testify at the evidentiary hearings. Consequently, Defendant has failed to demonstrate any prejudice by a failure to call Mr. Viking as a witness and has failed to satisfy the second prong of *Strickland*. As such, no relief is warranted as to [this claim].

> . . . .

> As to Robert Walborne,[26] the record reflects that the State called Mr. Walborne as a witness during its case in chief. Although the State called Mr. Walborne as a witness at trial, Defendant has met the *Highsmith* test. Defendant has identified the witness and alleged that Mr. Walborne would have testified that the 9mm projectiles recovered from Defendant's residence had been lodged in the walls long before Defendant moved in and [the victim] was shot. Furthermore, Defendant argues that a different outcome would have resulted in that "Defendant would not have been convicted of a crime he did not commit." However, Defendant failed to call Mr. Walborne to testify at the evidentiary hearings. Consequently, no evidence of testimony was presented with regard to Mr. Walborne. Defendant has failed to demonstrate any prejudice by a failure to call Mr. Walborne as a witness and has

---

[25] Cuellar testified about eliciting testimony from Walborn supporting Petitioner's alibi defense but was not questioned about calling Walborn to testify about the bullet holes. (Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 44-45, 57). Post-conviction counsel did not inquire of Petitioner about his allegations that Viking or Walborn could have testified about the bullet holes.

[26] The state post-conviction court's order incorrectly spells the witness's last name as "W-a-l-b-o-r-n-e." The correctly spelling is "W-a-l-b-o-r-n." (Doc. 20, Ex. 1, Vol. III, p. 180).

failed to satisfy the second prong of *Strickland*.  As such, no relief is warranted as to [this claim].

(Doc, 20. Ex. 8A, pp. 6-8).[27]

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (citations omitted).[28]  Trial counsel must decide which strategic and tactical option to pursue.  *See, e.g., Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it.'").  A habeas petitioner must overcome a presumption that the challenged conduct of one's counsel was a matter of strategy.  *Strickland*, 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  A defendant's disagreements with counsel's tactics or strategies will not support a claim of ineffective assistance of counsel.

Petitioner provides no evidence (1) that either Viking or Walborn was available and willing to testify at trial or (2) that either Viking or Walborn would have testified as Petitioner hypothesizes. *See, e.g., Bray v. Quarterman*, 265 Fed. App'x 296, 298 (5th Cir. 2008) ("To prevail on [a claim of

---

[27] Relying upon *Ferrell v. State*, 918 So. 2d 163 (Fla. 2005), Respondent argues that Petitioner "waived and abandoned" his ineffective assistance of counsel claims as to Viking and Walborn because he did not call either of them to testify at the Rule 3.850 evidentiary hearing. (Doc. 18, p. 44).  In *Ferrell*, the defendant at his Rule 3.850 evidentiary hearing affirmatively elected not to proceed with certain witnesses.  The Supreme Court of Florida concluded that the defendant's decision to forego the presentation of such evidence at the evidentiary hearing resulted in a waiver of his claim.  *Ferrell*, 918 So. 2d at 173.  As discussed, *supra*, post-conviction counsel cross-examined both Cuellar and Petitioner about the investigation of both Viking and Walborn and the decision not to call them as witnesses at trial. Petitioner did not waive or abandon his claims; rather, he failed to present certain evidence (testimony from either Viking or Walborn) to support the claims at the Rule 3.850 evidentiary hearing.

[28] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

ineffective assistance of counsel for failing to call a witness], the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). *See also Ashimi*, 932 F.2d at 650. Petitioner does not establish that either Vikings's testimony or Walborn's testimony about the bullet would have been sufficient, in light of all the other evidence adduced at trial, to result in a different verdict. Absent a demonstration of prejudice, Petitioner cannot prevail on these claims of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92. Petitioner fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting these claims. *See* 28 U.S.C. § 2254(d)(1), (2).

(d)  Fingerprint expert

Petitioner contends that he "informed counsel specifically that investigation of the crime scene fingerprints would establish someone other than Petitioner was inside the victim's home when he was shot." (Doc. 1, p. 8). Petitioner argues that his trial counsel rendered ineffective assistance by not presenting this "favorable" evidence at trial.

Neither the prosecutor nor the defense presented evidence at trial that the fingerprints collected from the crime scene were ever submitted to a latent fingerprint examiner for analysis and neither party called a latent fingerprint expert to testify at trial. Both Cuellar[29] and Friscia[30]

---

[29] Cuellar testified:

Q:    What defense did you provide as far as the fingerprints on the beer can and the entrance was where the perpetrator allegedly came in?

A:    There was a lack of evidence. The only evidence they had was that [the victim] said Mr. D'Amico was the one but there wasn't any physical evidence to tie him to the scene of the

(continued...)

[29](...continued)
       crime.

Q:      Didn't you earlier testify that the detective said that there were prints on the beer can but they didn't either point to Mr. D'Amico or to clear him, either one, or they were of no value one way or the other as to Mr. D'Amico?

A:      That's correct, but nobody can say that Mr. D'Amico's fingerprints were ever taken from the scene so that goes hand in hand. It's a lack of evidence. It's not anything that ties him to the scene so had they gotten fingerprints that were comparable or that compared to Mr. D'Amico, that would have been physical evidence to tie him to the crime, but there was none elicited, so this was a case where you had the victim that put him at the scene, not physical evidence.

Q:      Did you not think that it was important perhaps to follow up on some type of investigation to find out whose fingerprints those were and, as TV goes, solve the crime for the police if they're not going to solve it themselves?

A:      Well, I don't know if he was deposed. If he was deposed, I don't recall. But I remember that I felt that it was sufficient to - - and we discussed this, regarding the lack of evidence aspect, and that there was argument in closing that there was nothing that tied him to the scene and it was definitely elicited from the detective that the cans were collected and it was definitely testified to by [the victim] that Mr. D'Amico touched the beer can and had the beer can in his hand, so it was all elicited. It was our method and our way of getting that out, but it came out.

Q:      But you didn't think that any individual investigation on your part was required to get that?

A:      No.

Q:      Is there a reason that you didn't ask the fingerprint expert when he testified that the prints were found whether, whether he ever identified whose they were?

A:      I think there is some confusion because the fingerprint expert, I don't believe, testified, so I don't know where you're getting that information.

      I believe that the FDLE person that testified was testifying about the bullet casings. I don't believe that - - and I might be wrong about that, that the fingerprint expert ever testified. I don't believe [the prosecutor] put him on. I might be wrong about that.

      And then that's when we decided that we didn't need to put him on, we would just say that the State didn't put him on, therefore, it's a good indication to you that he wasn't going to help the State and there is no evidence that ties Mr. D'Amico to the scene and including no witnesses ever came in and said, you know, that Mr. D'Amico's prints were on this beer can.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., pp. 59-61).

      As discussed, *supra* at n.4, crime scene detective Kim Copeland testified that she collected fingerprints from both the back door of the victim's home and a beer can recovered from the victim's home. Copeland testified that she

(continued...)

_____

[29](...continued)
was not responsible for ordering the processing of those fingerprints by a latent fingerprints examiner.  (Doc. 20, Ex. 1, Vol. III, pp. 150-51).  No fingerprint expert testified at trial.

Cuellar further testified on redirect examination:

Q:     Ms. Cuellar, if the defense had called an FDLE expert and that expert advised that there were latent fingerprints developed of comparative quality, could not the State Attorney have elicited from him the fact that fingerprints are not always left when a person touches an item?

A:     Correct.  And I could definitely tell you that they fished those beer cans out of the garbage can.  This would indicate why there weren't comparable fingerprints on that and one left on the coffee table.

       It was not that prints were not of comparison value, they would have testified that they just didn't have anything to compare it with.  So they couldn't say whether or not Mr. D'Amico touched it, so we thought that it was just as effective to do what we did.

Q:     If not more so?

A:     Right.

Q:     To have the jurors wonder when they go back to deliberate what happened with these fingerprints, were there fingerprints or not?

A:     Right.

(Doc. 20, Ex. 10, Vol. II, transcript of March 15, 2001, evid. hrg., p. 62).

[30]  Friscia testified:

Q:     There was testimony through the case detective that these beer cans were located?

A:     Yes.

Q:     And that there were fingerprints found on the beer cans and there was a fingerprint removed from the rear door of the residence?

A:     That's correct.

Q:     But there was no testimony and no expert presented by the state as to whose fingerprints those were or if they ever matched the defendant?

A:     That's correct.

Q:     And I believe it's on pages 11, 12, and 19 of your closing argument you argued that fact to the jury and you never heard whether these were matched to our client or anybody else's?

A:     That's correct.

                                                                                          (continued...)

testified at the evidentiary hearing that they made a strategic decision not to call a latent fingerprint expert but instead to highlight in closing argument both the prosecutor's failure to call a fingerprint expert and the lack of physical evidence linking Petitioner to the crime.  Petitioner testified at the evidentiary hearing that he discussed calling an FDLE fingerprint expert to testify at trial with both Cuellar and Friscia but "nothing was ever done."  (Doc. 20, Ex. 10, Vol. II, transcript of Oct. 4, 2011, evid. hrg., p. 11).

Following the evidentiary hearing, the state post-conviction court rejected this claim:

Defendant claims counsel failed to investigate and present at trial the F.D.L.E. fingerprint expert who would have testified that Defendant's fingerprints were not found on a beer can left at the crime scene by the perpetrator or on the back door where the perpetrator allegedly entered and exited the crime scene.  Defendant has met the *Highsmith* test.  Defendant has identified the witness and alleged that the fingerprint expert would have testified that the fingerprints did not belong to Defendant, thereby resulting in a different outcome.  However, Ms. Cuellar testified that the decision to not call the fingerprint expert was a tactical decision.  Ms. Cuellar believed that it would leave a question in the jury's minds regarding the lack of fingerprints.  Consequently, the court finds that the defendant has failed to prove any deficient conduct on the part of his trial counsel with regard to the failure to call the F.D.L.E. fingerprint expert.  Therefore, Defendant has failed to satisfy the first prong of *Strickland*.  As such, no relief is warranted as to [this claim].

―――――――――――――――――

[30](...continued)

. . . .

Q:    Was that a strategic decision you made?

A:    Certainly.  It was lack of evidence the state failed to prove or connect Mr. D'Amico with the crime scene.

Q:    Is that part of your trial strategy?

A:    Yes.

Q:    It wasn't an oversight?

A:    No.  That issue was never discussed to bring in an expert outside to disprove what was not proved.

(Doc. 20, Ex. 10, Vol. III, transcript of June 7, 2001, evid. hrg., pp. 14-16).

(Doc. 20, Ex. 8A, p. 16).

Petitioner fails to overcome the presumption that counsels' decision to forego calling a fingerprint expert was anything other than trial strategy. *Strickland*, 466 U.S. at 689; *Perry*, 908 F.2d at 59. Petitioner only speculates about the testimony of a fingerprint expert and presents no evidence showing such expert would have testified as Petitioner hypothesizes.[31] *See Ashimi*, 932 F.2d at 650. Petitioner fails to demonstrate that counsels' performance fell outside the bounds of reasonable professional judgment. *See Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir.2001), *cert. denied*, 535 U.S. 1000 (2002) (holding that petitioner did not establish ineffective assistance based on defense counsel's failure to call an expert witness because petitioner failed to show that counsel's decision was so patently unreasonable that no competent attorney would have chosen that strategy). Petitioner fails to support his speculative contention that the proposed testimony of a latent fingerprint expert would have resulted in his acquittal and fails to meet either *Strickland's* deficient performance requirement or prejudice requirement to support a claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92. The state post-conviction court neither unreasonably applied *Strickland* nor unreasonably determined the facts in rejecting this ground. *See* 28 U.S.C. § 2254(d)(1), (2).

---

[31] The record includes a copy of a document from the Hillsborough County Sheriff's Office in response to Petitioner's request for information about the fingerprints collected in his case. (Doc. 20, Ex. 47, attachs. A, I). The document appears to be a "latent print report" for fingerprints received by the agency on September 19, 1995. The document bears Petitioner's name and under the category "ID REMARKS" is the word "NEGATIVE." Petitioner contends that (1) this document proves that the fingerprints from the back door of the victim's home and the beer can taken from the victim's home were submitted to a latent fingerprint examiner for analysis and (2) this document affirmatively shows that the fingerprints do not match Petitioner's.

**Ground Six**

Petitioner contends that his trial counsel rendered ineffective assistance by not impeaching

the victim with his prior inconsistent statements.  Specifically, Petitioner alleges:

> [The victim] made statements prior to trial that were inconsistent and contradicted
> in his trial testimony.  For instance, the record established [the victim] stated to law
> enforcement that money was stolen from the residence on the night in
> question **- while he was still in the hospital recuperating from the gunshot
> wound**.  Again, later in the investigation, [the victim] stated money was stolen from
> the residence the night he was shot **but stated that he did not know this *prior* to his
> release from the hospital**.  Additionally, [the victim] gave various and distinctly
> different descriptions of the perpetrator's clothing on that night.[32]

(Doc. 1, p. 10) (emphasis in original).

    a.    <u>Stolen money</u>

The victim testified on direct examination at trial that he returned home to look for his cash

four days after leaving the hospital and discovered the money was missing.  (Doc. 20, Ex. 1, Vol.

IV, p. 243).  Attorney Cuellar elicited on cross-examination of the victim that he told the police

about the missing money while he was still in the hospital.  She was subsequently got the victim to

admit that he did not know the money was missing until *after* he left the hospital.[33]  Petitioner claims

---

[32] Petitioner correctly points out in his reply that Respondent "does not address the second part of Ground Six regarding [the victim]'s inconsistent descriptions of the shooter['s] clothes."  (Doc. 29, p. 22).  Petitioner apparently intends the sentence in his petition that the victim "gave various and distinctly different descriptions of the perpetrator's clothing on that night," to be an assertion of a separate substantive claim of ineffective assistance of counsel for allegedly failing to impeach the victim at trial with his deposition statements about what Petitioner was wearing the night of the shooting.  Petitioner presented this claim to the state post-conviction court in his 1999 Rule 3.850 motion and was granted an evidentiary hearing.  This court is mindful of its responsibility to address and resolve all claims raised in a petition.  *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir.1992) (instructing "the district courts to resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254").  Affording Petitioner a liberal construction of his petition, the court considers the merits of this allegation as an independent substantive claim of ineffective assistance of counsel.

[33] The victim testified on cross-examination:

    Q:    Okay.  Now, this money that you said was missing, it's more like one thousand eight
           hundred, wasn't it?

                           (continued...)

that counsel failed to impeach the victim with his inconsistent statements about when he told the

police he discovered the money was missing.

The state post-conviction court summarily rejected this claim in Petitioner's 1999 Rule 3.850

motion:

> As to [the victim]'s statements about the story about the alleged theft of money, Defendant claims what while in the hospital, [the victim] told investigators that money had been taken from his residence. However, [the victim] also claimed that he did not discover that the money was missing until after he returned home from the hospital. The record reflects that on direct examination, [the victim] testified that he did not go home to look for his money until after he got out of the hospital four days after the incident. On cross-examination, [the victim] testified that while in the hospital, he told the detectives of the missing money.

---

[33](...continued)

A:      Yes, just a little under two thousand dollars, I said.

Q:      And there was no police report made on [the] missing money?

A:      Yes, there was. I told the detective at several different points, I told the detective in the hospital when I was in the recovery room after they took me out of the emergency room.

        . . . .

        In the hospital I told the detective that - - the first detective that came to me, and said that we need, you know, to catch this person in the first few hours, you know, I told him about the monies. I told the detective at - -

Q:      Do you remember his name?

A:      No, ma'am. I - - no, ma'am.

Q:      All right.

A:      It was the investigating detective.

Q:      But you didn't know your money was missing until after you got out of the hospital, right?

A:      Right.

Q:      Okay. And you have no way of knowing who took your money?

A:      No, I don't.

(Doc. 20, Ex. 1, Vol. IV, pp. 268-70).

> On cross-examination, defense counsel did impeach [the victim] when he stated, "But you didn't know your money was missing until after you got out of the hospital, right?"  Since counsel did impeach [the victim] with respect to the story about the alleged theft of the money, Defendant has failed to met the first prong of *Strickland* in that he has failed to prove deficient conduct.  Since Defendant has failed to meet the first prong of *Strickland*, it is unnecessary to address the prejudice component. As such, no relief is warranted upon this ground.

(Doc. 20, Ex. 7, pp. 9-10) (court's record citations omitted).

The record confirms that, contrary to Petitioner's contention, trial counsel impeached the victim with his prior inconsistent statements about the stolen money.  Petitioner establishes neither deficient performance or resulting prejudice under *Strickland* to warrant relief on this claim. Because Petitioner fails to meet his burden of proving that the state post-conviction court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim, he cannot obtain relief.  *See* 28 U.S.C. § 2254(d)(1), (2).

    b.    <u>Perpetrator's clothing</u>

The victim testified on direct examination at trial that Petitioner was wearing a green pea coat on the night of the crime.  (Doc. 20, Ex. 1, Vol. IV, p. 227).  Cuellar cross-examined the victim on this issue as follows:

Q:    And after this 15 to 20 minute conversation [with Petitioner], only then did you notice that this guy is wearing a pea coat?

A:    I knew he was wearing a pea coat when I grabbed both hands on his coat, when I reached over, grabbed his pea coat and lifted up and started walking him down the hall [from the victim's bedroom].  I knew I was holding some type of heavy jacket.  When I got him to the light, I could see that this, in fact, was a pea coat.

Q:    And the individual was also wearing a maroon tie you said?

A:    I never said he wore a maroon tie.

43

Q:      No, you didn't?

A:      Okay.  If it's in the record, please, let's hear it.

Q:      I'll be happy to.

A:      I said if he was wearing a maroon tie, I couldn't tell you.  I said he had a pea coat on.  You badgered me.

. . . .

Q:      The question[34] was:   ["]You just don't recall whether you didn't?["]  Answer: ["]I didn't.  It's like I see his coat.  It's blue.["]  And you said the coat was blue?

A:      I don't recall saying it was blue.

Q:      Okay.  And the answer was: ["]I didn't - - it's like, see his coat, it's blue, but if you ask me later what kind of shirt he was wearing, I couldn't tell you because his coat is covering it.  I could tell you he had a maroon tie on because the tie stood out.["]  Would you like to read your answer?

A:      I was using a circumstance there.  I was not indicating that [the perpetrator] was wearing a tie and a blue coat.

Q:      Are you telling me that that was not your answer?

A:      If you read the paragraphs before that and after that, I think you'll clearly see after asking me four times what color shirt he was wearing, I kept telling you, four times I told you I don't know because he had a coat on.  I used that for a - -

Q:      Are you telling us that you did not give that answer?  Would you like to read it?

A:      I gave it.

---

[34]  Read in context, counsel appears to refer to the victim's deposition testimony.  Neither Petitioner nor Respondent has included as an exhibit a copy of the victim's deposition.

(Doc. 20, Ex. 1, Vol. IV, pp. 259-63).[35]

Petitioner asserts that counsel failed to impeach the victim with his prior inconsistent statements about Petitioner's clothing. The state post-conviction court denied this claim:

> Defendant claims defense counsel failed or neglected to impeach [the victim] with his inconsistent statements about what the perpetrator was wearing. However, during the March 15, 2001, evidentiary hearing, Ms. Cuellar testified that she attempted to cross-examine the victim with regard to what the perpetrator was wearing, however, the victim was adamant that it was the Defendant who committed the crime. Additionally, during trial, Ms. Cuellar attempted to impeach the victim as to his inconsistent statements regarding what the victim was wearing. Consequently, the court finds that the Defendant has failed to prove any deficient conduct on the part of his trial counsel with regard to the failure to impeach the victim. Therefore, Defendant has failed to satisfy the first prong of *Strickland*. As such, no relief is warranted as to [the claim].

(Doc. 20, Ex. 8A, p. 8) (court's record citations omitted).

The record supports the state post-conviction court's rejection of this claim. Petitioner establishes neither deficient performance nor resulting prejudice under *Strickland*. Because Petitioner fails to meet his burden of proving that the state post-conviction court unreasonably applied

---

[35] The prosecutor reiterated on re-direct examination the consistency of the victim's deposition statements and his trial testimony:

Q:     Now, when this deposition, when Ms. Cuellar said what was [Petitioner] wearing, what did you say?

. . . .

A:     [Petitioner] was wearing a green pea coat.

. . . .

[S]he had asked me the same question, she had badgered me, she asked me the same question four times in the deposition, and it's clearly listed in that deposition, if you look, and I gave her the same answer four times. I said he was wearing a green pea coat. He was wearing a green pea coat until I was tired of saying it.

(Doc. 20, Ex. 1, Vol. IV, pp. 274-75).

controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim, Petitioner cannot obtain federal habeas relief.  *See* 28 U.S.C. § 2254(d)(1), (2).

**Ground Seven**

Petitioner contends that his trial counsel rendered ineffective assistance by not conducting a pre-trial investigation into Petitioner's competency to stand trial.  Petitioner argues that, although counsel knew (as allegedly evinced by his medical records at the jail) Petitioner was taking "high dosages of psychotropic medication (Elavil)," counsel "made an unreasonable decision to ignore this evidence." (Doc. 1, pp. 11-12).  Petitioner alleges that he proceeded to trial while suffering side effects from the medication which rendered him "unable to prompt counsel to fully impeach [the victim]" and "unable to inquire as to his witnesses and the full presentation of the latent fingerprint evidence." (Id. at p. 12).

This ground was a subject of the Rule 3.850 evidentiary hearing and was denied by the state post-conviction court. (Doc. 20, Ex. 8A, pp. 9-10).  Under state procedural rules, to obtain appellate review, Petitioner was obligated to brief this ground.  *See* Fla. R. App. P. 9.141(b)(3)(C).  The state rule requiring submission of an appellate brief bars Petitioner from returning to state court to challenge the denial of his ineffective assistance of counsel claim in a second appeal of the denial of the 1999 Rule 3.850 motion.  *See* Fla. R. App. P. 9.141(b)(3)(C).  Petitioner's failure to assert on post-conviction appeal the claim presented in Ground Seven of his federal habeas petition results in the default of this ground.  *See Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979) (stating that exhaustion of a claim raised in a Rule 3.850 motion includes an appeal from the denial of the motion).  *See also Duest v. Dugger*, 555 So. 2d 849 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal.  Merely making reference to arguments

46

below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").

In his reply, Petitioner argues that, "[t]o the extent Petitioner did not present any arguments on the claim in his post-conviction appeal and procedurally defaulted the claim, the default is attributable to the ineffective assistance of his post-conviction attorney." (Doc. 29, p. 23). More specifically, Petitioner argues that post-conviction counsel "failed to offer any evidence, such as the results of a competency examination by an expert, the psychiatric or psychological records from the jail, or at least some form of expert testimony, that would show that Petitioner was incompetent at the time of his trial." (Id.). As a result of post-conviction counsel's inaction, Petitioner claims he "was not able to reasonably argue the claim in his [*pro se*] post-conviction appeal," and that he has cause under *Martinez* to excuse his default. (Id.).

As discussed *supra* at n.23, to the extent that Petitioner asserts an independent substantive claim of ineffective assistance of post-conviction counsel for (1) failing to elicit testimony at the Rule 3.850 evidentiary hearing about Petitioner's competency to stand trial and (2) failing to investigate his competency, Petitioner cannot obtain relief. *Arthur*, 739 F.3d at 629-31. To the extent Petitioner argues that *Martinez* affords him a basis to overcome his failure to assert on post-conviction appeal the claim presented in Ground Seven, he likewise cannot obtain relief. *Martinez* specifically states that its holding "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings." 132 S. Ct. at 1320. Consequently, Petitioner cannot use post-conviction counsel's failure to either elicit certain testimony or present certain evidence at the post-conviction evidentiary hearing as cause to excuse his own failure to pursue his claim on post-conviction appeal.

47

Petitioner fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Petitioner fails to proffer specific facts showing an exception to procedural default, Ground Seven is procedurally barred from federal review.

**Ground Eight**

Detective William Blake testified at trial that he interviewed Petitioner's roommate, Jeff Owen, four days after the crime. According to Detective Blake's contemporaneous interview notes, Owen stated (1) that he did not know if Petitioner was home on the night of the crime, (2) that he had previously seen Petitioner with a black semi-automatic 9 mm handgun, and (3) that he had previously seen Petitioner fire the handgun in the house. (Doc. 20, Ex. 1, Vol. V, pp. 378-79). Conversely, Owen testified at trial that (1) he saw Petitioner in the house on the night of the crime, (2) he had never seen Petitioner in the house with a gun, and (3) he had never seen Petitioner shoot into the walls of the house. (Doc. 20, Ex. 1, Vol. VI, pp. 304, 307).

Based on the above cited testimony, Petitioner contends that Detective Blake gave "perjured testimony about [Petitioner's roommate] Jeff [Owen] observing the discharge of a 9mm handgun by Petitioner" and that [the perjured testimony] was material and went uncorrected at trial," thereby "eliminat[ing] Petitioner's alibi defense."[36] (Doc. 1, p. 13). The state post-conviction court summarily rejected this ground in Petitioner's 1999 Rule 3.850 motion. Petitioner argues that this

---

[36] Petitioner cited these same allegations in the second addendum to his Rule 3.850 motion to support a claim of prosecutorial misconduct based on the prosecutor "knowingly eliciting and/or failing to correct, and capitalizing on during closing argument . . . the false and perjured testimony by the State's chief investigating detective William Blake, where the perjured testimony went to undermine [Petitioner]'s alibi . . . ." (Doc. 20, Ex. 10, Vol. I, second add. to 1999 Rule 3.850 motion, pp. 1-2). To the extent that Petitioner intends to assert the same claim raised in the Rule 3.850 motion, the court construes Ground Eight as alleging a claim of prosecutorial misconduct and a violation of due process.

48

rejection was either an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts.

The state post-conviction court summarily rejected this ground based on state procedural rules:

> Defendant claims prosecutorial misconduct whereby the State used during closing arguments perjured testimony by the State's chief investigating detective William Blake. Defendant further claims that the perjured testimony undermined Defendant's alibi defense and discredited the Defendant and his alibi witnesses in the eyes of the jury. However, a defendant's claim alleging improper closing argument should have been raised on direct appeal. *Kelley v. State*, 569 So. 2d 754, 756 (Fla. 1990). As such, no relief is warranted upon this ground.

(Doc. 20, Ex. 7, pp. 14-15).

The failure of a federal habeas petitioner to adhere to state procedural rules governing the proper presentation of a claim generally bars federal review of that claim in a subsequent federal habeas corpus proceeding. *See Coleman*, 501 U.S. at 722; *Wainwright v. Sykes*, 433 U.S. 72, 97 (1977); *Sims v. Singletary*, 155 F.3d 1297, 1311 (11th Cir. 1998). "However, a state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion," or in a "manifestly unfair manner." *Id.*

The state post-conviction court expressly relied upon an independent and adequate state procedural bar to reject Petitioner's substantive claims of prosecutorial misconduct and violation of due process.  The state appellate court affirmed the application of the procedural bar.  Consequently, Ground Eight is procedurally defaulted.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989).  *See also Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (finding that the state appellate court's *per curiam* affirmance of the lower court's ruling explicitly based on procedural default is a clear and express statement of its reliance on an independent and adequate state law ground barring federal review).

Petitioner fails to demonstrate cause and prejudice excusing his default.  *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96.  He neither alleges nor shows that the fundamental miscarriage of justice exception applies.  *Henderson*, 353 F.3d at 892.  Because Petitioner fails to proffer specific facts showing an exception to procedural default, Ground Eight is procedurally barred from federal review.[37]

**Ground Nine**

Petitioner contends that the cumulative effect of trial counsels' errors "altered the entire evidentiary picture and the verdict was only weakly supported by the record."  (Doc. 1, p. 14).  Petitioner did not present a cumulative error claim to the state post-conviction court.  Consequently, the claim is unexhausted.

---

[37]  Petitioner argues in his reply that, because he "raised [in his 1999 Rule 3.850 motion] a claim that his convictions had been obtained in violation of Fourteenth Amendment due process through the prosecutor's knowing use of perjured testimony by Detective Blake, . . . [he] asserted a *Giglio*[*v. United States*, 405 U.S. 150 (1972)], violation" which the state post-conviction court "recharacterized as . . . alleging improper closing argument by the prosecutor and denied it on the basis it should have been raised on direct appeal."  (Doc. 29, p. 28).  Petitioner alleges that his *Giglio* claim is exhausted and not procedurally defaulted because such claim "is typically raised in a post-conviction motion because it is usually discovered after the trial is over."  (Id.).  Petitioner did not cite *Giglio* in his Rule 3.850 motion and thus did not alert the state court that he was asserting a *Giglio* claim.  The claim is, therefore, unexhausted.

Petitioner cannot return to state court to present his claim because state procedural rules prohibit him from filing another Rule 3.850 motion. *See* Fla. R. Crim. P. 3.850(b). Consequently, the claim is procedurally defaulted. Petitioner fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Petitioner fails to proffer specific facts showing an exception to procedural default, Ground Nine is procedurally barred from federal review.

Notwithstanding the procedural bar, Petitioner cannot obtain relief on Ground Nine because he has not proven any of his claims of ineffective assistance of trial counsel. "Without harmful errors, there can be no cumulative effect compelling reversal." *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984), *cert. denied*, 469 U.S. 1158 (1985). Because Petitioner's grounds of ineffective assistance of trial counsel are denied on the merits for the reasons stated *supra*, no cumulative prejudicial effect results. *See Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003) ("Because the sum of various zeroes remains zero, the claimed prejudicial effect of [counsel's] cumulative errors does not warrant habeas relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

## Ground Ten

The Office of the Public Defender was appointed to represent Petitioner both at trial and at the Rule 3.850 evidentiary hearing. Petitioner moved to discharge post-conviction counsel based upon a conflict of interest, a motion the state post-conviction court denied. (Doc. 20, Ex. 10, Vol.

II, p. 6).   Petitioner alleged in the appeal of the denial of the 1999 Rule 3.850 motion that the state post-conviction court abused its discretion and denied him due process and equal protection by appointing the public defender to represent him despite his objection to such representation.   (Doc. 20, Ex. 11, Rule 3.850 appellate brief, pp. 39-40).   The state appellate court rejected this claim. Petitioner now claims that "[t]he state courts' denial of post-conviction relief is tainted by the complete denial of due process of law within those proceedings creating a violation of the Fifth and Fourteenth Amendment[s] and contrary to the controlling Supreme Court precedent."

Petitioner bases this ground on the allegations that post-conviction counsel "failed to afford [him] a fair hearing by not examining witnesses," failed to "introduc[e] evidence establishing trial counsel was completely ineffective," failed to issue witness subpoenas, failed to review files and records (specifically jail medical records and latent fingerprint records), and was "absolutely unprepared to adduce any evidence to establish Petitioner's claims against [post-conviction counsel's] co-workers."   (Doc. 1, p. 16).   Petitioner further claims that post-conviction counsel's unpreparedness allowed the prosecutor to provided perjured testimony at the evidentiary hearing.

Post-conviction proceedings are "civil in nature and are not part of the criminal proceeding itself."   *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987).   A prisoner's challenge to the process afforded him in a state post-conviction proceeding does not constitute a cognizable claim for habeas corpus relief.   *See Carroll v. Sec'y, Dep't of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004).   "The reasoning behind this well-established principle is straightforward:   a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment - i.e., the conviction itself - and thus habeas relief is not an appropriate remedy."   *Carroll,* 574 F.3d at 1365 (citations omitted).

The due process violation Petitioner alleges in Ground Ten occurred during a state post-conviction proceeding, not during his criminal trial. The process afforded Petitioner during the post-conviction proceeding had no bearing upon the finding of guilt that led to his convictions and sentences. Because Ground Ten does not represent a constitutional challenge to Petitioner's confinement, it does not constitute a ground for federal habeas relief.

**Ground Eleven**

Petitioner alleges that on October 22, 2007, the Hillsborough County Sheriff's Office disclosed, in response to Petitioner's public records request, a copy of a report with the results of a fingerprint comparison performed on February 21, 1996, which excluded Petitioner as the person who left the fingerprints on the back door of the victim's home and the beer can recovered from the victim's home. Petitioner claims that the State never disclosed this "material and exculpatory evidence" during the trial or post-conviction proceedings and that he only discovered the evidence through his own due diligence and his threat to sue the Hillsborough County Sheriff's Office. Petitioner contends that the state post-conviction court's "denial of post-conviction relief in light of proof that the crime scene fingerprint comparison excluded Petitioner violates due process of law and renders the trial unfair where the State was well aware of this material evidence and failed to disclose it, proving actual innocence." (Doc. 1, p. 18).

Respondent characterizes this ground as one alleging actual innocence and argues that such a claim is not a cognizable basis for federal habeas relief. (Doc. 19, p. 69). In his reply, Petitioner clarifies that he presents in Ground Eleven, not an actual innocence claim, but rather the same two due process violations "based on Petitioner's claims in his [2009] Rule 3.850 motion that newly discovered evidence revealed the State has suppressed material exculpatory evidence in violation of

*Brady v. Maryland*, [373 U.S. 83 (1963)], and had then presented false testimony [that] the evidence did not exist in violation of *Giglio v. United States*, [405 U.S. 150 (1972)]." (Doc. 29, pp. 16-17). The court addresses Ground Eleven as alleging due process violations rather than actual innocence.[38]

The state post-conviction court rejected both the *Brady* and *Gigilo* claims in the 2009 Rule 3.850 as untimely under state rules because Petitioner was aware of the facts supporting both claims at the March 15, 2001, Rule 3.850 evidentiary hearing. (Doc. 20, Ex. 46, pp. 3-7). The state post-conviction court expressly relied upon an independent and adequate state procedural bar to reject Petitioner's *Brady* and *Giglio* claims. The state appellate court affirmed the application of the state procedural bar. Consequently, Ground Eleven is procedurally defaulted. *See Harris*, 489 U.S. at 262; *Harmon*, 894 F.2d at 1274.

Petitioner fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Petitioner fails to proffer specific

---

[38] The court notes that Petitioner did mention actual innocence in his allegations related to the fingerprint expert discussed in Ground Four(d), *supra*. However, even if considered as an actual innocence claim, as Respondent points out, such a claim is not a cognizable basis for relief. A free-standing claim of actual innocence cannot be brought as a substantive claim for relief in a federal habeas action. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995) ("[A] claim of innocence is . . . 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'") (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

facts showing an exception to procedural default, Ground Eleven is procedurally barred from federal review.

Accordingly, it is **ORDERED AND ADJUDGED** that Petitioner's Section 2254 petition (Doc. 1) is **DENIED** with prejudice. The clerk is directed to enter judgment against Petitioner and close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE AND ORDERED** in chambers this 26th day of March, 2014.

JAMES D. WHITTEMORE
United States District Judge